UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROCKWELL MEDICAL, INC. and
ROBERT CHIOINI,

       Plaintiffs,      Case Number 13-10480

v.              Honorable David M. Lawson

RICHARD YOCUM, M.D.,

       Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DISMISSING MOTIONS *IN LIMINE*, AND DISMISSING COMPLAINT

Before the Court is the motion by defendant Richard Yocum for a summary judgment of dismissal on the remaining counts of the complaint. Yocum was hired as plaintiff Rockwell Medical Technologies, Inc.'s vice president of drug development, but was fired two-and-a-half years later, in September 2011. Yocum sued Rockwell in California for wrongful termination, but his lawsuit was dismissed. Rockwell then brought the present case against Yocum, alleging that Yocum defamed Rockwell and violated various non-disclosure provisions of his employment agreement by statements made before and as a part of the California lawsuit. Rockwell also contends that Yocum misappropriated its tangible and intellectual property. After reviewing the initial motion papers, hearing the parties' oral argument on September 25, 2014, and considering the supplemental briefs, the Court concludes that the plaintiffs have not identified sufficient evidence in the record to create a triable fact question on any of its contract or business tort claims. Therefore, the Court will grant the defendant's motion for summary judgment and dismiss the complaint.

I.

Rockwell is a pharmaceutical company.  It hired Yocum as its vice president of drug development on February 23, 2009.  Yocum was responsible for consulting about clinical testing on various drugs and communicating with doctors to market the company's drugs and to monitor clinical trials.  Yocum signed an Employee Confidential Information Non-Compete and Invention Agreement, under which he agreed not to disclose any confidential or proprietary information.

Rockwell alleges that its relationship with Yocum began to deteriorate in 2010 because Yocum withheld important information from Rockwell regarding drug trials; spent all or most of his working hours conducting personal business and seeking other employment; disclosed confidential information about clinical trials to third parties; and spread false rumors that drugs under testing had not performed as expected or were in jeopardy of not receiving FDA approval. As a result, Rockwell alleges that it lost $50 million in market capitalization, based on the decline in the market price of its stock.  Rockwell fired Yocum on September 17, 2011.

A. Employee Non-Disclosure Agreement

The parties do not dispute that when he began his employment with Rockwell, Yocum entered into a confidentiality and non-compete agreement with the company.  Neither party has made any representation as to whether this confidentiality agreement constituted the entire contract between the parties meant to govern the defendant's employment, but it is the only document evidencing a contract between them that has been made a part of the record.  The confidentiality agreement contains the following provisions that are relevant to the plaintiffs' claims:

> Through my employment with the Company, I understand that I may be exposed to and entrusted with great amounts of confidential information concerning, among other things, the Company's (a) customer lists, clients, contacts, and prospects; (b) personnel resources and training techniques; (c) business, management, pricing,

-2-

advertising and financial structures; and (d) other data pertaining to the Company's operations. Such information is highly confidential and represents the property and trade secrets of the Company.

. . .

I hereby warrant that during the period of my employment with the Company, or at any time thereafter, I will not divulge to any other person, firm, or corporation, either directly or indirectly, whether obtained before, during, or after my employment with the Company, the following:

A.     The names and/or addresses of the Company's customers, clients, suppliers, business contacts and prospects;

B.     The names and/or addresses of the Company's employees, agents, or personnel resources;

C     The method of marketing employed or later developed by the Company in promoting its services;

D.     The Company's pricing system and how the Company determines the price of its services and/or wages of its employees, agents, or personnel;

E.     The services offered by the Company or that are, or will be, developed and/or offered by the Company;

F     The price of any of the Company's services;

G.     The wages and benefits paid to the Company's employees and agents;

H.     The types and amounts of expenses incurred or profits made by the Company in its operations;

I.     The techniques, business methods, management and financial expertise of the Company; and

J.     Any other information which the Company deems confidential and secret, of which I may become aware.

In addition, during my employment and the time thereafter, all information listed above shall be considered a trade secret and the property of the Company and any and all records, paper, documents and/or copies thereof pertaining to such information shall be returned immediately upon the termination of my employment.

Def.'s Mot. for Summ. J., Ex. 1, Employee Confidential Information Non-Compete and Invention Agreement ¶ 5.

## B. Disclosures and Accusations Made by Yocum

Rockwell appears to premise all of its claims for breach of contract, misappropriation of trade secrets, tortious interference, and defamation on three instances of wrongful disclosure of confidential or purportedly false information: (1) information disclosed in Yocum's complaint for wrongful termination filed in California; (2) statements made during a 5-10 minute telephone

conversation on an unspecified date between Yocum and Michael Xirinachs, one of Rockwell's investors; and (3) statements made by Yocum to Christopher L. Carey, a reporter for an online publication, in response to questions from Carey during a phone interview about the allegations stated in the California complaint.

### 1. Allegations in the California Complaint

On January 20, 2012, Yocum filed his complaint for wrongful termination against Rockwell in the San Diego, California superior court.  The case was removed to federal court in San Diego and later dismissed.

The complaint alleged that "a motivating factor for Plaintiff's termination [wa]s his reporting of, complaining about, and other opposition to fraudulent, unlawful, and unethical acts, including violations of Securities and Exchange Commission Regulation FD, violations of FDA regulations, violations of ICH Practices, and misrepresentations."  Def.'s Mot. for Summ. J., Ex 4, Compl. ¶ 80, *Yocum v. Rockwell Medical*, No. 37-2012-91097 (Cal. Sup. Ct. Jan 20, 2012).  The complaint alleged that while Yocum was employed by Rockwell, the company was conducting "clinical trials for Soluble Ferric Phosphate ("SFP"), an experimental iron therapy drug intended to help treat iron-deficiency anemia."  *Id.* ¶ 25.  Yocum alleged that he repeatedly complained about and pointed out to Rockwell CEO, Robert Chioni, defects in the protocols that were used or planned for use in the clinical trials, and his concerns that the results of earlier "Phase IIb" trials did not support the decision to move ahead with "Phase III" trials.

As to the alleged defects in Rockwell's testing protocol for SFP, Yocum asserted, among other things, that: (1) "the [Phase IIb] study was a failure"; (2) "the results of the study did not provide adequate efficacy data or dose ranging information to proceed directly to Phase III trials";

(3) "because of the inadequate dose selection data, and lack of confirmation of efficacy in Phase II, as well as other untested major design aspects of the proposed Phase III trials, Plaintiff consistently and repeatedly urged Chioini and Rockwell to conduct additional Phase II studies before proceeding to Phase III"; (4) in July 2011, the FDA "indicated agreement with Plaintiff's assessment [that] 'no dose response pattern was identified among the dose groups for SFP in [the] completed Phase II study'"; (5) in December 2010, "the FDA . . . rejected Rockwell's proposed Phase III trial design"; (6) "[d]espite the FDA's disapproval, Rockwell commenced Phase III trials"; and (7) Rockwell "failed to disclose the risks of the [Phase III] trials to the public [and] failed to disclose . . . the extent of its disagreement with the FDA." *Id.* ¶¶ 25-27, 30, 32-34, 37, 39-41.

Yocum further alleged that Chioni and Rockwell made misleading statements about the progress of the SFP trials and ignored his recommendation that the trial protocol should be revised to take account of risks that were required to be disclosed under new labeling language recently mandated by the FDA for SFP-type drugs. In particular, Yocum alleged that: (1) in August 2011, Rockwell publicly announced that SFP would enter the commercial market in 2013, despite the fact that "[b]etween May 2011 and August 2011, the Phase III program did not accelerate [and] Phase III studies enrollment was lower than projected"; and (2) in June 2011, "three months after patients began to enroll in SFP Phase III studies, the FDA announced a new product label for [the type of drugs that would be given to patients in the Phase III trials]," and "[t]he new FDA label conflicted with the planned Phase III clinical trials," because the dosing protocol did not account for the label recommendation that dosages should be reduced if "hemoglobin levels approached or reached 11 g/DL." *Id.* at 43-46, 48-50.

Yocum asserted that throughout his employment he "continued to advocate to Chioini that Rockwell's Phase III trials be revised to comply with the revised FDA label, and with clinical experts' advice," and "continued to caution Chioni that this was a patient safety issue"; but "Chioni continued to ignore Plaintiff's concerns." *Id.* ¶¶ 55-56.  Yocum contended that "Rockwell risked patient safety if it failed to change the Phase III clinical trial design," and that the trial design was inconsistent with guidelines for protecting the "rights, safety, and well-being of trial subjects" published by the FDA. *Id.* ¶¶ 62-63.  Finally, Yocum alleged that public statements made by the company concerning the efficacy and safety of its SFP drugs violated FDA regulations governing the promotion of new drugs under clinical investigation, and that the numerous alleged "selective disclosures" of information set forth in the complaint, regarding the drug testing results and prospects for approval of SFP for the commercial market, "were in violation of Securities and Exchange Commission Regulation FD." *Id.* ¶¶ 66, 68.

### 2. Yocum's Conversation with Michael Xirinachs

Michael Xirinachs was an investor in Rockwell.  He testified that he spoke with Yocum by phone sometime in 2011, but he could not recall the month or day.  He stated that Yocum indicated he wanted to sell a block of Rockwell shares that he had received as part of his compensation and, "talked about how . . . there were a lot of problems at Rockwell because of [its] FDA trials [and] about how mismanaged the company was [and that] there was withheld information regarding the FDA trials."  Def.'s Mot. for Summ. J., Ex. 7, Xirinachs dep. at 8.  Xirinachs testified that Yocum was "pretty negative on the company."  *Ibid.*  He stated that the conversation lasted for five or ten minutes, but when asked if he could recall any details, such as what information was withheld or what the problems were with the drug trials, Xirinachs stated that he either did not ask or could not

-6-

recall any.  When asked if he took any action in response to this conversation, Xirinachs said only that he reported to Tom Klema, CFO of Rockwell, and to Chioni that "Dr. Yocum was very negative about the company."  *Id.* at 12-14.  When asked, if the conversation, "contribute[d] in any way [to] any decision [that he made] regarding the purchase of Rockwell stock," Xirinachs answered "None." *Id.* at 13.  Asked if he "took any action one way or the other as a result of what [Yocum] said to you," regarding any investments, Xirinachs answered "I did not take any action."  *Ibid.*

### 3. Yocum's Conversation with Christopher L. Carey

Carey stated in his affidavit that he wrote a series of articles about Rockwell that were published between November 3, 2009 and August 28, 2013.  The "articles were based upon information and documents obtained by me from public records, including . . . filings with the Securities and Exchange Commission, court filings and pleadings, and Rockwell website postings, including its Annual Reports."  Def.'s Mot. for Summ. J., Ex. 5, Carey aff. ¶ 2.  Carey admited that he spoke to Yocum before he published his June 20, 2012 article, but "Yocum advised me that he would not provide me any information that was not contained in the complaint filed on his behalf in the California state court," and "other than correcting a typographical error contained in the complaint which I called to his attention, he did not do so."  *Id.* ¶ 3.  Carey "asked Dr. Yocum if his concern regarding patient safety remained unchanged and whether he had brought his concerns to the attention of the SEC or the FDA," and Yocum "indicated that unless Rockwell had modified the Phase 3 Study design, his concern with respect to patient safety remained unchanged," and "he did not directly answer my second question."  *Ibid.*

C. Rockwell Property Kept by Yocum

In support of the breach of contract claim, Chioni alleges in his affidavit that "Yocum still has materials of Rockwell (see deposition three) and importantly he wrongly kept, used and relied on them from the date of his discharge until at least mid-2014," and "Yocum admits he still has Rockwell materials and documents and a disc." Pl.'s Resp., Ex. H, Chioni aff. at 3, 5 (citing Pls.' Resp., Ex. M. Yocum dep. (Feb. 6, 2014) at 95-97, 107, 109-110). In his 2014 deposition, Yocum admitted that he still possessed "a small number of documents that were necessary to protect public safety and to protect me." Yocum dep. at 107. He stated that these documents included (1) minutes of meetings between Rockwell and the FDA; (2) emails between Yocum and Chioni regarding the FDA's change in labeling for ESA drugs; and (3) "a summary of the expert input we had regarding how we should respond to the change in ESA labeling by the FDA." *Id.* at 109-110. Yocum stated that he also had "a copy of my personnel file from Rockwell," and "a number of press releases and SEC reports . . . that I obtained from the Rockwell website." *Id.* at 110. In a subsequent affidavit, Yocum stated that: (1) "on September 17, 2011, I sent Rockwell the laptop computer that had been issued to me by Rockwell, together with a number of other Rockwell items I had acquired during the course of my employment, all of which are pictured in the photograph attached hereto as Exhibit A"; (2) "[o]n December 11, 2012, I also sent to Rockwell 7-8 discs worth of Rockwell documents which I had downloaded from my personal computer [that] I neglected to include . . . with the Company property and documents . . . returned in October 2011"; and (3) "all other Rockwell documents in my possession, custody, or control have since been destroyed, with the exception of [those produced to the plaintiffs during discovery in the California case], [and] those documents which have been sent to me by Rockwell since the termination of my employment [relating to

-8-

certain post-termination employee benefits and compensation]."  Def.'s Mot. for Summ. J., Ex. 3, Yocum aff. ¶¶ 3-4.

### D. Procedural History

After he was fired, Yocum sued Rockwell in California for wrongful termination.  Rockwell moved to dismiss for lack of jurisdiction or to transfer venue to this Court, but the district court denied its motion.  On April 30, 2013, the district court granted Rockwell's motion for summary judgment and dismissed the case on the merits.

While the California wrongful termination action still was pending, Rockwell filed a complaint of its own in this Court on February 6, 2013, alleging breach of contract (count I); misappropriation of trade secrets (count II); tortious interference with business relationships (count III); breach of fiduciary duty (count IV); conversion (count V); claim and delivery (count VI); and defamation (count VII).  On April 26, 2013, Yocum filed a motion to dismiss for lack of personal jurisdiction and insufficient service of process, or in the alternative to transfer venue to the Southern District of California, and on July 10, 2013 he filed his answer to the complaint.  The Court denied the motion to dismiss or transfer on August 29, 2013.

Discovery closed on December 31, 2013, and the Court's original case management and scheduling order set a dispositive motion cutoff date of January 15, 2014.  Yocum filed his motion for judgment on the pleadings that day, addressing count IV (breach of fiducuciary duty) and count VII (defamation).  On June 26, 2014, the Court granted that motion in part and dismissed count IV. The Court also granted in part the defendant's motion to extend the dispositive motion cutoff date, deemed the defendant's March 27, 2014 motion for summary judgment to be timely filed, and ordered the plaintiffs to file a response by July 18, 2014.  The plaintiff filed a response, which did

not cite portions of the record to support its claims that fact issues existed.  The Court pointed out those defects at oral argument and allowed supplemental briefing.  Those briefs have been received, and the motion is ready for decision.

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When determining if a trial is necessary to resolve the claims, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

Rule 56 is a procedural rule that applies in this Court.  The parties agree that in this diversity case, Michigan substantive law governs.  *See* 28 U.S.C. § 2072(b); *see also Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938); *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 417 (2010) (Stevens, J., concurring) (reiterating the "long-recognized principle that federal courts sitting in diversity 'apply state substantive law and federal procedural law'" (quoting *Hanna v. Plumer*, 380 U.S. 460, 465 (1965))).

Under Rule 56, "[t]he party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts."  *Alexander*, 576 F.3d at 558 (citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)).  "Once that occurs, the party opposing the motion then may not 'rely on the hope that

the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Id.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

The defendant complied with this procedure by filing a brief, attaching affidavits and deposition excerpts, citing specific portions of the record, and advancing particular arguments. The defendants contend that (1) all of the claims for wrongful disclosure and publishing of defamatory statements that are premised on allegations made in the California complaint (including count I for breach of the nondisclosure agreement) are precluded as a matter of law by the absolute privilege for statements made in the course of litigation; (2) the Michigan Uniform Trade Secrets Act, Mich. Comp. Laws § 445.1901, *et seq.*, preempts all claims based on common law misappropriation and any other common law theory (e.g., for conversion, claim and delivery, and defamation) that are premised upon improper taking or distributing information alone; (3) the information allegedly disclosed does not constitute "trade secrets" under the Michigan Act; (4) the plaintiffs have not identified any contract that was breached or business expectancy that was thwarted as a result of anything Yocum said or did; (5) the counts for conversion and claim and delivery of tangible documents and property must be dismissed because the defendant has destroyed or returned all company property that he had, other than copies of documents produced during discovery in the California litigation, and records from his own personnel file; and (6) the plaintiffs have failed to show that they suffered any special damages from any allegedly defamatory statements made to Xirinachs or Carey, because Xirinachs testified that he did nothing other than report the conversation to two Rockwell company officers, and Carey's article reported nothing said by Yocum other than

the allegations stated in the complaint, which was a matter of public record.  The defendant asks the

Court to dismiss all the remaining counts of the complaint.

The plaintiffs' first response to the summary judgment motion was not particularly helpful.

The plaintiffs did not address any of the specific issues raised by the defendants.  Instead, they

framed the "statement of issues" set forth in their brief as follows:

> Are there genuine issues of fact based on the extensive record of depositions,
> pleadings, documents, affidavits, records, expert opinions, admissions, previous
> court rulings, in this case and the earlier California case between the parties as to
> Counts II, III, V, VI and VII?  [Defendant brings no challenge as to Count I; the
> Court dismissed Count IV earlier.]  Mr. Chioini's detailed Affidavit, attached as
> Exhibit H, covers entirely, factually rebuttal to all Defendant's positions.  It is
> requested the Court review this Affidavit thoroughly.

Pls.' Resp. [dkt. #68] at iv.  The balance of their brief consists almost entirely of a 22-page statement

of "background facts," many of which appear to concern claims that were raised in the earlier

wrongful termination case, *e.g.*, "No Reports, No Complaints, No Illegalities," *id.* at 2-4; "Yocum's

Poor Performance," *id.* at 4-9.  Much of this material bears no apparent relation to any of the counts

in the present complaint, and the defendant asserts in his reply that substantial portions of it appear

to be recycled from briefs previously filed in the California case.

Following the "statement of facts," the plaintiffs set forth what appears to be a summary of

their position, which amounts to little more than an exhibit list and an invitation for the Court to

"closely review" the cited materials.  The plaintiffs then devote two sentences to the summary

judgment standard, and set forth a four-paragraph "argument" that does not discuss — and only

obliquely even acknowledges — any of the elements of the plaintiff's claims.  The plaintiffs'

argument does not address, or even mention, any of the specific defenses raised by the defendant,

such as the absolute privilege for statements made during the course of judicial proceedings.

Moreover, the plaintiffs' argument cites a number of lengthy depositions and other documents, without any page references and without quoting any specific material, to support their conclusory assertion that "All of Plaintiffs['] Counts are factually supported."

The supplemental brief that the plaintiffs filed improves on their earlier submission only by annotating their statement of facts with references to the discovery materials in this case. The argument portion is unchanged and does not address the issues raised by the defendant.

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "Thus, the mere existence of a scintilla of evidence in support of the [opposing party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." 350 F.3d at 546 (quoting 477 U.S. at 252) (quotations omitted).

Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v.*

*Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting 477 U.S. at 248).

In a defensive motion for summary judgment, the party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).

Based on the argument that the plaintiffs have presented, it appears that rather than submitting a brief in the usual fashion, pointing out specific facts in the record and citing relevant legal authority to show that the plaintiffs have submitted sufficient evidence to present each of their claims to a jury, they have instead simply invited the Court to review the 500+ pages of material submitted as exhibits to their response and to conclude on its own, with no illuminating assistance from the plaintiffs as to the relevant rules of law, that their claims are "factually supported." However, the "district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived," and "[i]t is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (quotations and alterations omitted).

-14-

Nonetheless, given what has been presented, the Court will attempt to address the defendant's arguments in light of the plaintiffs' submissions.

### A.   Judicial proceedings privilege

The defendant points out that many of the claims of wrongful disclosure and defamation are based on statements in Yokum's complaint filed in the California court.  He asserts that he enjoys immunity from suit for those statements.

"Statements made by judges, attorneys, and witnesses during the course of judicial proceedings are absolutely privileged if they are relevant, material, or pertinent to the issue being tried."  *Oesterle v. Wallace*, 272 Mich. App. 260, 264, 725 N.W.2d 470, 474 (2006).  "'Judicial proceedings' may include any hearing before a tribunal or administrative board that performs a judicial function," and "immunity extends to every step in the proceeding and covers anything that may be said in relation to the matter at issue, including pleadings and affidavits."  *Id.* at 265, 725 N.W.2d at 474 (quotation marks omitted).  "The judicial proceedings privilege should be liberally construed so that participants in judicial proceedings are free to express themselves without fear of retaliation."  *Couch v. Schultz*, 193 Mich. App. 292, 295, 483 N.W.2d 684, 686 (1992).  The privilege "applies to statements made in a settlement letter just as it does to statements made" in any other stage of the proceedings.  *Oesterle*, 272 Mich. App. at 268, 725 N.W.2d at 476.

The defendant is entitled to absolute immunity from any disclosure or defamation claims based on allegations made in the complaint, because all of the statements that arguably could be construed to relate to the plaintiffs' claims were pertinent to the defendant's claim that he was wrongfully terminated for complaining about or disclosing the concerns he had that the plaintiffs' improper drug protocols, misrepresentations, and concealment had endangered patients and deceived

-15-

investors who bought the company's stock in reliance on the prospects for approval of its SFP drugs. The plaintiffs did not address the judicial proceedings privilege in their response, and they have pointed to no authority to establish that the plainly relevant statements made in the complaint should not be afforded the protection of this "liberally construed" privilege.

### B. Breach of contract claims

To state a claim for breach of contract under Michigan law, a plaintiff must first establish the elements of a valid contract. *Pawlak v. Redox Corp.*, 182 Mich. App. 758, 765, 453, N.W.2d 304, 307 (1990). The elements of a valid contract in Michigan are (1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation. *Thomas v. Leja*, 187 Mich. App. 418, 468 N.W.2d 58, 60 (1990). Once a valid contract has been established, the plaintiff must then prove (1) the terms of the contract, (2) breach of those terms by the defendant, and (3) injury to the plaintiff resulting from the breach. *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003).

The parties do not dispute that a contract existed between them in the form of the confidentiality agreement. However, the plaintiffs' claims for breach of contract must be dismissed because they have failed to identify any specific item of allegedly "confidential" information that the defendant disclosed in breach of the terms of the nondisclosure terms of that agreement.

Moreover, it is evident that none of the information regarding Phase III trial designs or the results of Phase II trials was confidential, because at a minimum this information was disclosed to the FDA in the course of seeking approval for the drugs, and it would necessarily have to be disclosed to patients and doctors involved in the trials. The remaining information allegedly "disclosed" related to statements made in public filings with the SEC or public statements made by

-16-

Chioni concerning the results of the drug trials and the prospects for marketing the drug, which Yocum simply asserted were demonstrably false based on the "failure" of the Phase II study to show any efficacy for the drugs.  It is apparent at the very least that the FDA was informed of the results of the Phase II trials, because it specifically advised the company that it appeared that those trials had not shown any positive results.  The information that the dosing protocols did not agree with the newly mandated FDA labeling standard for "ESA" type drugs would be apparent to anyone with knowledge of the published standard label language and the dosing protocols for the Phase III tests.  The fact that the confidentiality agreement purports to extend to "any information" that the Company deems "confidential," at its whim, is not sufficient to establish that "disclosure" of that information not actually kept secret was a breach of that agreement.  *See Nagler v. Garcia*, 370 F. App'x 678, 681 (6th Cir. 2010) ("[The plaintiff] cites a provision in the Confidentiality Agreement to the effect that all information would be considered confidential 'even if it could also have been acquired in a non-confidential manner.'  But that provision is unenforceable under Michigan law.") (citing *Follmer, Rudzewicz & Co. v. Kosco*, 420 Mich. 394, 362 N.W.2d 676, 683 (1984) (refusing to enforce a clause that would make someone pay damages "for using information labeled confidential which is not in fact confidential")).

### C.  Trade secrets

The plaintiffs' claims for misappropriation and wrongful disclosure of trade secrets are governed by the Michigan Uniform Trade Secrets Act, which expressly "displace[d] conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." Mich. Comp. Laws § 445.1908; *CMI Int'l, Inc. v. Intermet Int'l Corp.*, 251 Mich. App. 125, 132, 649 N.W.2d 808, 812-13 (2002) (citing *Compuware Corp. v. Serena Software Int'l, Inc.*, 77

-17-

F. Supp. 2d 816, 820, n.12 (E.D. Mich. 1999)).  Those statutory claims must be dismissed because the plaintiffs have not identified any piece of information allegedly disclosed by the defendant that constitutes a "formula, pattern, compilation, program, device, method, technique, or process, that . . . [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use."  Mich. Comp. Laws § 445.1902(d).  None of the information regarding the outcome of clinical trials, the design of those trials, compliance of the trial designs with FDA regulations, or the refusal of the FDA to approve the trial designs constitutes any sort of "formula, pattern, compilation, program, device, method, technique, or process," as those terms reasonably can be understood.  Moreover, it is evident that none of the information relating to the Phase III trial protocols was "the subject of efforts that are reasonable under the circumstances to maintain its secrecy," because they were, at a minimum, disclosed to the FDA for the purpose of seeking approval of the trial design, and they necessarily would have been disclosed to patients involved in the trials and doctors conducting them.

As much as it may be discerned from their response, since the plaintiffs do not address the statute at all, it appears that plaintiffs' position is that information regarding failed trials, unwarranted risks to patients, and the lack of approval for Phase III trial designs by the FDA somehow constituted "trade secrets" merely because the nondisclosure agreement extended to "any other information" that the company might not wish not to reveal.  And they evidently believe that alleged lies and misrepresentations made by them in an effort to conceal this information from the public and regulatory authorities constitute reasonable efforts to maintain its secrecy.  They have not cited any authority to support either of those novel propositions.

-18-

Finally, although Chioni contends that "[e]very paragraph/fact in Carey's article requires Rockwell confidential/non-public or trade secret information from Yocum to be published," Pl.'s Resp., Ex. H, Chioni aff. at 2, he does not point to even one identified statement that represents a cognizable trade secret or confidential information. And the text of the article, Def.'s Mot. for Summ. J., Ex. 5, Carey dep. (Ex. B, Article dated June 20, 2012), so far as it relates to Yocum, consists almost entirely of a narrative restatement of the various specific allegations set forth in the complaint itself.

## D.  Tortious interference

Under Michigan law, the elements of tortious interference with a business relationship or expectancy are (1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the defendant, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage to the plaintiff. *Cedroni Association, Inc. v. Tomblinson, Harburn Associates, Architects & Planners Inc.*, 492 Mich. 40, 45, 821 N.W.2d 1, 3 (2012) (citing *Dalley v. Dykema Gossett PLLC*, 287 Mich. App. 296, 323, 788 N.W.2d 679, 696 (2010)). "In order to establish [a valid business expectancy," the plaintiff must show that the expectancy was "a reasonable likelihood or probability, not mere wishful thinking." *Cedroni*, 492 Mich. at 45, 821 N.W.2d at 3 (citing *Trepel v. Pontiac Osteopathic Hosp.*, 135 Mich. App. 361, 377, 354 N.W.2d 341, 348 (1984)) (quotation marks omitted). "[O]ne who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *Formall, Inc. v. Cmty. Nat. Bank of Pontiac*, 166 Mich. App. 772, 779, 421

-19-

N.W.2d 289, 292 (1988) (quotation marks and citations omitted).  The "plaintiff must demonstrate, with specificity, affirmative acts by the interferer which corroborate the unlawful purpose of the interference."  *Id.* at 292-93.

The plaintiffs' claim for tortious interference must be dismissed because the plaintiffs have failed to establish the existence of any specific contractual relationship with any person or entity, or that any relationship that may have existed either was breached or thwarted by the defendant's conduct.  Moreover, because all of the other, underlying tort and misappropriation claims fail, the plaintiffs cannot show that any conduct related to any alleged disclosure or publication was wrongful or malicious.  The plaintiffs assert that "the contracts negatively affected were with suppliers, vendors, investors, bankers, doctors (in studies), patients (in studies, *see* Consent Form, Exhibit C.), and that "[a]ll were known to Yocum, affected wrongly, damaged and/or declined."  Pls.' Resp. at 25.  But the plaintiffs have failed to identify any "supplier[], vendor[], investor[], banker[], doctor[] . . . or patient[]" involved in a specific contractual relationship with them that was disrupted.  As to the alleged "numerous inquiries" from investors or potential investors regarding the allegations in Yocum's complaint, the plaintiffs have not established that they had any definite and firm expectation of investment from any of them, or that any of these various unnamed investors had entered into any relationship with the company that would give rise to more than a hope or wish that they would purchase or hold its stock.

Chioni asserts that the company had a "contract" with Michael Xirinachs, but it is difficult to discern from the record presented by the plaintiffs what relationship Rockwell had with him, because the alleged "contract" for unspecified services that Chioni mentions was not discussed in any detail in the plaintiffs' response, and it is not evidenced by any documents or testimony that the

Court could find in the record.  Nevertheless, Chioni asserts, with regard to the statements allegedly made to Xirinachs:

> Yocum called [Xirinachs] and stated that there were a lot of problems at Rockwell because of their FDA trials, Rockwell was mismanaged, and there was information withheld regarding FDA trials, there were lots of problems with FDA trials, and there had been omissions from Rockwell of misleading information; all of this told by Yocum to Xirinachs is false, defamatory and severely damaging.  Further, we had a contract with Xirinachs which he could not fulfill successfully to get investments due to the false, negative information Yocum told him when he called Xirinachs, as Xirinachs had a duty to discuss / disclose same to investors.

Pl.'s Resp., Ex. H, Chioni aff. at 5.  However, the plaintiffs have not suggested any facts that could establish that any breach of the purported agreement occurred.  Moreover, the naked allegations set forth in Chioni's affidavit are belied by Xirinachs's testimony, in which Xirinachs admitted that he could not recall the day — or even the month — of the conversation with Yocum; he could not recall any details of the statements made, beyond his impression that Yocum was "very negative"; in response to the conversation, he took no action at all, other than relating it to two Rockwell employees; and it had no effect on any decisions he made, or advised anyone else to make, regarding investments in Rockwell's stock.

### E.  Conversion and claim and delivery

In Michigan, conversion has both a common-law and statutory basis.  Common law conversion "consists of any distinct act or domain exerted over another's personal property in denial of or inconsistent with the rights therein." *Dep't of Agric. v. Appletree Marketing, L.L.C.*, 485 Mich. 1, 13-14, 779 N.W.2d 237, 244 (2010) (citation omitted).  There are two forms of statutory conversion:

> (a) Another person's stealing or embezzling property or converting property to the other person's own use.

> (b) Another person's . . . possessing [or] concealing . . . stolen, embezzled, or converted property when the person . . . possessing [or] concealing . . . knew that the property was stolen, embezzled, or converted.

Mich. Comp. Laws § 600.2919a.

The common law action formerly denoted "'[r]eplevin' is now known as the action of claim and delivery," and is governed by statute. Mich. Comp. Laws § 600.2920; *Whitcraft v. Wolfe*, 148 Mich. App. 40, 44 n.1, 384 N.W.2d 400, 402 n.1 (1985). The claim and delivery statute states:

> A civil action may be brought to recover possession of any goods or chattels which have been unlawfully taken or unlawfully detained and to recover damages sustained by the unlawful taking or unlawful detention, subject to the following conditions: . . .
> (c) An action may not be maintained under this section by a person who, at the time the action is commenced, does not have a right to possession of the goods or chattels taken or detained.

Mich. Comp. Laws § 600.2920.

The plaintiffs' claims for conversion and claim and delivery must be dismissed because, notwithstanding the extended and hotly litigated disputes the parties have had over the return of various documents and computer discs that Yocum received through his employment, the plaintiffs have failed to establish that he presently wrongfully possesses any tangible items belonging to the company. Rockwell insists that Yocum retained a laundry list of specific items for years after his employment ended, but Yocum testified that he returned a substantial package of documents and discs, along with his laptop computer, in October 2011, and that he only inadvertently retained until 2012 certain other electronic information that he did not remember was stored on his personal computer. Yocum asserts that when he realized he still had information on his personal computer, he returned it to Rockwell on a series of computer discs, and his personal laptop and the hard disk containing the information has since been destroyed. Yocum maintains that everything he had

-22-

belonging to the company either has been returned or destroyed, excepting (1) documents produced during discovery in the California litigation, which were filed as part of his pleadings and motion papers in that case; and (2) documents that Rockwell sent to him concerning his post-termination benefits and other personnel matters. The plaintiffs have offered nothing to rebut this testimony, and they have not identified any specific items which they contend Yocum presently has in his possession. Moreover, the plaintiffs appear to concede that they have no idea what, if anything, Yocum still may have. Pls.'s Resp. at 25 ("Yocum kept, continued to keep and use materials, documents, discs, etc. (does he still have?).").

In their supplemental filing, the plaintiffs emphasize the admissions by Yocum that he did retain certain documents after he left Rockwell's employment. However, the plaintiffs make no argument explaining how simply keeping some papers can possibly connect with claimed damages exceeding $50 million in alleged lost market value of the company's stock. As to the disclosures made in the California complaint — which evidently could have been a major precipitating factor in the claimed damages — the plaintiffs offer nothing to establish that the defendant is not fully shielded by the litigation privilege, or to establish that the disclosures were defamatory, prohibited by the Michigan Uniform Trade Secrets Act, or included "confidential" information as contemplated under the non-disclosure agreement.

## F. Defamation

To establish a claim for defamation, the plaintiff must show (1) a false and defamatory statement concerning the plaintiff, (2) unprivileged publication to a third party, (3) fault amounting to at least negligence on the part of the publisher, and (4) either actionability of the statements irrespective of special harm, or the existence of special harm caused by the publication. *Wilson v.*

-23-

*Sparrow Health System*, 290 Mich. App. 149, 154-55, 799 N.W.2d 224, 227 (2010).   "A communication is defamatory if it tends to lower an individual's reputation in the community or deters third persons from associating or dealing with that individual."   *Ireland v. Edwards*, 230 Mich. App. 607, 614, 584 N.W.2d 632, 636 (1998).

This claim must be dismissed, principally because the plaintiffs have failed to identify any specific false statement uttered by Yocum, and they have offered no facts to prove that any statement he did make was false.  Moreover, as to the element of special harm, the plaintiffs merely invite the Court to read their experts' reports — without offering any foundation to establish the means by which the amounts stated by their experts were determined — and to conclude that the plaintiffs have suffered unspecified "monumental losses" that "continue to mount."

### III.

For the reasons stated in detail above, the Court finds that the plaintiffs have not identified particular facts in the record that would be admissible at trial that create a genuine issue of material fact on any of the counts in the complaint.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment [dkt. #50] is **GRANTED**.

It is further **ORDERED** that the complaint is **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the defendant's motions *in limine* [dkt. #54, 55, 75] are **DISMISSED as moot**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  December 30, 2014

-24-

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 30, 2014.

s/Susan Pinkowski
SUSAN PINKOWSKI